[No. G012327. Fourth Dist., Div. Three. Nov. 29, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
MYNOR ARNOLD RODRIGUEZ, Defendant and Appellant.

## COUNSEL

Jill M. Bojarski, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett B. Beaumont and Maxine P. Cutler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WALLIN, Acting P. J.**—Mynor Arnold Rodriguez, a minor tried as an adult, appeals from his conviction of second degree murder. He contends the identification of him as a suspect resulted from a photograph obtained during an illegal "gang sweep" field interrogation and thus his motion to suppress the photograph and subsequent identifications should have been granted. He also contends the court erroneously imposed the aggravated term for gun use, claiming his use of a gun was no worse than ordinary. We affirm the conviction, but remand for resentencing.

On October 21, 1990, Roberto "Eddie" Gonzalez, the murder victim, was walking to a convenience store in the City of Orange with his friends,

Esteban De Paz, Juan Martinez and Edmundo Sanchez. They had just crossed Tustin Avenue when three Hispanic youths riding bicycles overtook them. One, later identified as Rodriguez, got off his chrome bicycle and challenged Eddie to reveal any gang affiliation. Included in Rodriguez's comments was the phrase, "Puro South Side." When Eddie did not respond, Rodriguez punched him in the face. Eddie backed away, and Rodriguez pulled a small pistol from his pants, pointed it at Eddie's chest and pulled the trigger. When the gun failed to fire, Eddie reached towards Rodriguez as though he was trying to take the gun away from him. Rodriguez pulled back the top of the gun and shot again, striking Eddie in the chest and killing him.

Eddie's three friends were interviewed by the police and each gave a description of the shooter, whom they did not know. Later that day, the three were shown a "gang book" consisting of photographs of known members and associates of local gangs. Sanchez identified a picture of Rodriguez, taken three days before, as that of the shooter; De Paz selected the photograph of another youth, and Martinez did not identify anyone from the book. After interviewing Rodriguez's father and uncle, police then went to the home of Angela Jackson, Rodriguez's girlfriend, and interviewed her. She told them Rodriguez had come by her house with a friend earlier that day and asked her to keep a chrome bicycle for him. He told her he had been present during a shooting and he was afraid the police might think he did it. He also changed his clothes and gave the ones he had been wearing to his friend. Rodriguez was arrested later that night.

On October 24, the police showed Eddie's three friends. "photo lineups," consisting of three folders of six photographs each, one of which included Rodriguez's booking photograph. All three identified Rodriguez as the shooter. De Paz and Martinez also identified Rodriguez as the shooter at trial.[1]

At trial, Rodriguez made a motion to suppress the "gang book" photograph and the subsequent identifications. The testimony at the hearing revealed that Don Hearn and John Whiteley, police detectives with the City of Orange, were assigned to the gang unit, which maintained a photographic file of known gang members and associates. The South Side F-Troop gang was one of the known gangs in the City of Orange.

On October 18, three days before Eddie Martinez was shot, Hearn and Whiteley saw Rodriguez and four companions standing together in front of an apartment complex on East Adams in Orange. Hearn knew the neighborhood was the turf of the South Side F-Troop gang and that the apartment

---

[1]At the time of trial, Sanchez had joined a gang and admitted he would "be a rat" if he pointed out the shooter in the courtroom.

complex was a common gathering place for gang members. South Side graffiti was written on the neighboring fences and walls, and Rodriguez and his companions were dressed in a manner consistent with gang membership. Rodriguez wore a jacket with the words "Dreamer" on the front and "F-Troop" on the back.

Hearn testified the group appeared to be doing nothing more than talking and socializing. He and his partner, both in uniform, approached the group intending to get the youths' identification, take their pictures and find out what gang they claimed. As he approached them, he told them to "stay there." He and Whiteley patted the youths down and ordered them to sit on the curb and the sidewalk. The officers then interviewed them one at a time, asking each about his name, address, date of birth, and so forth, and took a photograph of each one. The entire process took 15 to 20 minutes.

The trial court denied the motion to suppress, stating "[W]here the police are able to enunciate nexus, which is really the suspicion of either gang activity, membership or affiliation, . . . detention is allowed for [field identification] stops for intelligence-gathering purposes and it's permissible." The trial court added, "[E]ven if the court felt that there was a taint, which I do not, . . . it's clear to this court that all three witnesses have an independent recollection . . . concerning the identification three days after the homicide."

I

■ We agree with the trial court's conclusion that Rodriguez was detained by the officers rather than involved in a consensual encounter, "which result[s] in no restraint of an individual's liberty whatsoever . . . ." (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784 [195 Cal.Rptr. 671, 670 P.2d 325].) A detention, on the other hand, occurs when, " '. . . in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573 [100 L.Ed.2d 565, 575, 108 S.Ct. 1975].) A show of official authority is sufficient to engender that belief in a reasonable person. (*United States v. Mendenhall* (1980) 446 U.S. 544, 554 [64 L.Ed.2d 497, 509, 100 S.Ct. 1870] (lead opn. of Stewart, J.).)

Here, the officers approached Rodriguez and his companions and ordered them to "stay there" while they were patted down for weapons. They were then told to sit down while the officers interviewed them one at a time. No reasonable person under these circumstances would believe he was free to leave.

■ We cannot agree, however, with the trial court's conclusion that the detention of Rodriguez was permissible. ■ "[I]n order to justify an

investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity." (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957]. See also *Terry* v. *Ohio* (1968) 392 U.S. 1, 21 [20 L.Ed.2d 889, 905-906, 88 S.Ct. 1868]; *In re James D.* (1987) 43 Cal.3d 903, 911 [239 Cal.Rptr. 663, 741 P.2d 161].)

The guarantees of the Fourth Amendment do not allow stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity. (*Brown* v. *Texas* (1979) 443 U.S. 47, 51-52 [61 L.Ed.2d 357, 362-363, 99 S.Ct. 2637]. See also *People* v. *Gonzalez* (1992) 7 Cal.App.4th 381, 386 [8 Cal.Rptr.2d 640]; *People* v. *Gallant* (1990) 225 Cal.App.3d 200, 208 [275 Cal.Rptr. 50].) ■ Mere membership in a street gang is not a crime. (*People* v. *Green* (1991) 227 Cal.App.3d 692, 699-700 [278 Cal.Rptr. 140].)[2] ■ Here, Detective Hearn testified Rodriguez and his companions were doing nothing suspicious when he approached them. Rather, he agreed that it was his department's policy to "stop individuals who [officers] believe may be involved in a gang and take the field identification information, in addition to a photograph, and then place that into police files for potential later use regardless of whether or not that individual is at that time involved in criminal activity . . . ." While this policy may serve the laudable purpose of preventing crime, it is prohibited by the Fourth Amendment. (*Brown* v. *Texas, supra*, 443 U.S. at p. 52 [61 L.Ed.2d at p. 363].)

■ The constitutionality of such a detention "involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." (*Brown* v. *Texas, supra*, 443 U.S. at pp. 50-51 [61

[2]Penal Code section 186.22, subdivision (a) punishes as a separate crime "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang . . . ." Although the officers here arguably had reason to suspect Rodriguez and his companions were street gang members, the statute carefully avoids punishing mere membership. "By using the phrase 'actively participates,' the California Legislature evidently sought to prevent prosecution of persons who were no more than nominal or inactive members of a criminal street gang. . . . To be convicted of being an active participant in a street gang, a defendant must have a relationship with a criminal street gang which is (1) more than nominal, passive, inactive or purely technical, and (2) the person must devote all, or a substantial part of his time and efforts to the criminal street gang." (*People* v. *Green, supra*, 227 Cal.App.3d at p. 700.) The officers here do not claim, nor does the prosecution assert, that they had reason to suspect more than mere membership in the South Side F-Troop gang.

L.Ed.2d at p. 362].) ■■ Public concern and outrage over the crime and senseless violence caused by street gangs is understandably strong. And the effectiveness of the "gang book" identification procedure is verified by its success in this case. But the police policy before us constitutes too significant an intrusion on individual liberties to be justified by the public interest. "A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." (*Id.* at p. 51 [61 L.Ed.2d at p. 362]. Cf. *Michigan Dept. of State Police* v. *Sitz* (1990) 496 U.S. 444 [110 L.Ed.2d 412, 110 S.Ct. 2481] [slight intrusion on motorists stopped briefly at sobriety checkpoints does not violate Fourth Amendment].)

## II

■■■■ Rodriguez argues the illegal detention requires suppression of the gang book photograph, the booking photograph, and all the identifications based on them as " 'fruit of the poisonous tree.' " (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].) ■ But not all evidence is fruit of the poisonous tree "simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Ibid.*)

■■■■ The prosecution argues any taint from the illegal detention was purged by Rodriguez's intervening criminal activity. In *People* v. *Coe* (1991) 228 Cal.App.3d 526 [279 Cal.Rptr. 362], the defendants in a burglary prosecution were identified by abandoned tools at the crime scene. The defendants moved to suppress the tools because they had been illegally seized by the police in a burglary prosecution several years before and had been marked and photographed by the police before being released to the defendants. The court held the suppression motion was properly denied because the defendants' commission of new crimes and abandonment of the tools were intervening independent acts attenuating any taint from the prior illegal search. (*Id.* at p. 535.) It pointed out ". . . there is no suggestion that the police illegally obtained the [earlier] warrant *in order* to mark the tools for future investigation." (*Id.* at p. 532, italics in original.)

In *People* v. *McInnis* (1972) 6 Cal.3d 821 [100 Cal.Rptr. 618, 494 P.2d 690], the defendant was identified by means of a booking photograph taken as a result of an illegal arrest for an unrelated crime. The court held the

denial of defendant's motion to suppress the photograph was proper, observing that taking a booking photograph was "standard police procedure [citation], bearing no relationship to the purpose or validity of the arrest or detention." (*Id.* at p. 825.) It found the connection between the illegal arrest and the present crime was " 'pure happenstance.' " (*Ibid.*)

■ The situation here, however, is somewhat different than that in the preceding cases, at least with respect to the gang book photograph. That photograph was obtained deliberately for use in future criminal investigations, and the connection between it and the identification of Rodriguez was not happenstance. This is a clear example of " 'exploitation of [the] illegality' " under *Wong Sun* v. *United States, supra,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455], and requires the suppression of the gang photograph.

■ Both the identifications from the booking photographs by Sanchez, De Paz and Martinez and the in-court identifications by De Paz and Martinez, however, are admissible because they were based on the witnesses' independent recollections of the crime. (*United States* v. *Crews* (1980) 445 U.S. 463 [63 L.Ed.2d 537, 100 S.Ct. 1244]; *People* v. *Teresinski* (1982) 30 Cal.3d 822 [180 Cal.Rptr. 617, 640 P.2d 753].) Rodriguez's picture in the photo lineup was different from the one in the gang book and all three recognized it independently from the gang book photo. "It is clear from *United States* v. *Crews* that if the witness, relying upon his memory of the crime, is able to identify the defendant based upon his physical appearance, the testimony of the witness rests upon an adequate independent basis; the fact that the witness learned the defendant's name as a result of illegal police action is irrelevant." (*People* v. *Teresinski, supra,* 30 Cal.3d at p. 834.)

### III

■ Rodriguez next claims the trial court erroneously imposed the aggravated term of five years for gun use. Penal Code section 12022.5, subdivision (a) provides for a sentence enhancement of three, four or five years for personal use of a firearm in the commission of a felony. The court must impose a four-year enhancement in the absence of aggravating or mitigating factors and must state its reasons for the choice of enhancement on the record at the time of sentencing. The trial court here imposed a five-year term, stating, "This is an aggravated allegation. This is a [section] 12022.5. . . . [T]he gun misfired and you had to re-rack."

"The essence of 'aggravation' relates to the effect of a particular fact in making the offense distinctively worse than the ordinary." (*People* v. *Moreno* (1982) 128 Cal.App.3d 103, 110 [179 Cal.Rptr. 879].) We fail to see how Rodriguez's act of "reracking" his pistol to correct a misfire makes his use of a firearm worse than the ordinary. It clearly demonstrates that the

shooting was intentional and not accidental, thus justifying the verdict of second degree murder. But the act was nothing more than preparatory to carrying out the intent to shoot, not an aggravating factor. On remand, the trial court should carefully review the record for specific aggravating factors, if they exist. (See *People* v. *Price* (1984) 151 Cal.App.3d 803, 813-815 [199 Cal.Rptr. 99].)

## IV

■ The remainder of Rodriguez's contentions can be disposed of summarily. He argues the testimony of Angela Jackson, his girlfriend, and all physical evidence retrieved from her house should be suppressed as fruits of the illegal detention. We need not address this contention, however, because Rodriguez did not move to suppress this evidence in the trial court and the issue has been waived. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 80-81 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Gonzales* (1991) 233 Cal.App.3d 1428, 1432 [285 Cal.Rptr. 218].) However, Rodriguez's assertion that the abstract of judgment does not accurately reflect the presentence credits awarded by the trial court is correct and is conceded by the Attorney General. The record reflects Rodriguez was awarded 753 days, but the abstract says 723 days. Accordingly, the abstract must be corrected.[3]

The judgment is affirmed and the matter is remanded to the trial court for resentencing and correction of the abstract of judgment.

Sonenshine, J., and Crosby, J., concurred.

A petition for a rehearing was denied December 21, 1993, and appellant's petitions for review by the Supreme Court were denied March 3, 1994.

---

[3]We granted Rodriguez's request, made after oral argument, to file a supplemental brief challenging CALJIC No. 2.90, the standard reasonable doubt instruction, in light of the United States Supreme Court's grant of certiorari in *People* v. *Sandoval* (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d 862], certiorari granted September 28, 1993, __ U.S. __ [125 L.Ed.2d 789, 114 S.Ct. 40] (Dock. No. 92-9049) and *Nebraska* v. *Victor* (1993) 242 Neb. 306 [494 N.W.2d 565], certiorari granted September 28, 1993, __ U.S. __ [125 L.Ed.2d 788, 114 S.Ct. 39] (Dock. No. 92-8894). The California Supreme Court has consistently upheld the instruction's language, derived from Penal Code section 1096 (*People* v. *Jennings* (1991) 53 Cal.3d 334, 385 [279 Cal.Rptr. 780, 807 P.2d 1009], cert. den. __ U.S. __ [116 L.Ed.2d 462, 112 S.Ct. 443]; *People* v. *Smith* (1992) 9 Cal.App.4th 196, 202 [11 Cal.Rptr.2d 645]), and we are bound by those decisions. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]; *People* v. *Smith, supra*, 9 Cal.App.4th at p. 202.) Accordingly, we summarily reject Rodriguez's constitutional challenge to CALJIC No. 2.90. It will be preserved if he wishes to pursue the issue further.